# Buchanan Ingersoll & Rooney PC
### Attorneys & Government Relations Professionals

Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA  19102-2555

**Paul J. Greco**
215 665 3814
paul.greco@bipc.com

T 215 665 8700
F 215 665 8760

www.buchananingersoll.com

June 22, 2016

**VIA ECF**

Honorable Paul G. Gardephe
United States District Court
 for the Southern District of New York
40 Foley Square, Room 2204
New York, NY 1007

> **Re:**  ***Miller Bros. Recom Corp., et al.*; United States District Court for the Southern District of New York; Civil Action No. 1:16-cv-03260 (PGG)(HBP).**

Dear Judge Gardephe:

We represent Petitioner Miller Bros. in the above-referenced action.  We have received a copy of Respondent Recom Corp.'s request for a pre-motion conference in connection with a motion that Recom Corp. plans to file under Fed. R. Civ. P. 12(b) challenging both personal jurisdiction and venue.  Miller Bros. opposes the anticipated motion, and in accordance with the Court's Individual Rule 4.A, it hereby summarizes its opposition.

## I. Executive Summary

Miller Bros. began this action by filing a petition to confirm an arbitration award that was rendered in this district following an arbitration hearing that was conducted here.  As will be set forth more completely below, this Court has authority to assert personal jurisdiction over Recom Corp. to confirm the award for several reasons, including that Recom Corp. agreed to arbitrate in this district, participated in the arbitration hearings held here, hired counsel here to help it defend the case, and engaged in conduct here that partly gave rise to the claims which were arbitrated.

In addition, and with respect to Recom Corp.'s venue challenge, Miller Bros. will demonstrate that venue in this district is entirely proper.  Contrary to Recom Corp.'s assertion, the parties' arbitration agreement does not contain a mandatory forum selection clause that specifies the court in which judgment on the award must be entered.  While the arbitration agreement which is set forth in a clause entitled "Dispute Resolution" does specify the location for conducting the arbitration itself, Recom Corp. waived that provision and agreed to arbitrate in New York.  Thus, since this is the judicial district in which the arbitration award was rendered, venue properly lies here.  *See* Federal Arbitration Act, 9 U.S.C. § 9 ("FAA").

**Buchanan Ingersoll ⚘ Rooney** PC
Attorneys & Government Relations Professionals

June 22, 2016
Page - 2 -

## II. <u>Factual Background</u>

This case arises out of a Supply Agreement for the purchase of solar panels. Miller Bros. is an electrical contractor, and in June of 2014, it agreed with Recom Corp. and its parents, successors, affiliates, and assigns to purchase 15.5 MW of solar panels. A copy of the Supply Agreement is attached hereto as Exhibit A.

After executing the Supply Agreement, the first shipment was supposed to arrive at a job site in early August, 2014. In late June, at about the time when the first shipment of panels should have been in transit, a Miller Bros. representative met with Recom Corp. representatives at a trade show in New York City, and during that meeting, Recom Corp. informed Miller Bros. that it was not going to be able to meet the original shipping dates. That conversation marked the beginning of the parties' dispute, with Recom Corp. subsequently defaulting completely.

On November 20, 2014, Miller Bros. filed a Demand for Arbitration with the American Arbitration Association pursuant to the Dispute Resolution Clause that is set forth in the Supply Agreement. The Dispute Resolution Clause provided, in pertinent part, that any dispute arising under the Supply Agreement would be submitted "for arbitration . . . in Trenton, New Jersey. . . The award through arbitration shall become final and binding on the Parties, and the Parties agree to waive any right of appeal against the arbitration award." *See* Supply Agreement at Section 30(a). Thus, although the arbitration agreement specified where the arbitration should be conducted, it did not specify the court in which judgment on the award had to be entered.

The parties proceeded to arbitrate their claims and defenses. They eventually agreed to waive the commitment to arbitrate in New Jersey, agreeing instead to conduct the arbitration New York City. Evidentiary hearings were held for two days in December, 2015, and Recom Corp. represented itself at the hearings in New York through its "General Manager" (a lawyer).

The arbitrators requested post-trial briefs, and Recom Corp. retained lawyers from Hogan Lovells' New York office to assist it. At Recom Corp.'s request, its New York lawyers drafted and filed the post-trial briefs and conducted oral arguments and closing statements for Recom Corp. from their New York office. After the Panel issued an award in Miller Bros.'s favor in March, 2016, Recom Corp.'s New York lawyers then assisted with drafting and filing a motion to modify the award. The Panel granted the motion in part and denied it part in April, 2016.

Miller Bros. then began this action to confirm the award. In choosing the proper venue, it followed the terms of the FAA which provides in pertinent part as follows:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then . . . any party to the arbitration may apply to the court so specified for an order confirming the award. . . If no court is specified in the agreement of the

**Buchanan Ingersoll & Rooney** PC
Attorneys & Government Relations Professionals

June 22, 2016
Page - 3 -

parties, then such application may be made to the United States court in and for
the district within which such award was made.

9 U.S.C. § 9. Since the parties had not provided in the Dispute Resolution Clause for the entry
of judgment on the award in a specific court, Miller Bros. filed its petition to confirm the award
in this Court because this is where the award was made. As will be set forth below, both
personal jurisdiction over Recom Corp. and venue properly exists in this district.

### III. <u>Argument</u>

#### A.    This Court Has Personal Jurisdiction Over Recom Corp.

Recom Corp. contends that the petition must be dismissed because it omits allegations
sufficient to establish personal jurisdiction over it, citing *Gaines v. Dickerson*, 2016 WL
1529896 (E.D.N.Y. Apr. 14, 2016) and *Pablo Star Ltd. v. Welsh Gov't*, 2016 1056590 (S.D.N.Y.
May 11, 2016) for this proposition. However, neither of these cases requires a petitioner to plead
allegations in support of personal jurisdiction. Rather, to the extent that the courts in these cases
dismissed the complaints for lack of jurisdiction, they did so because the plaintiffs were unable
to adduce the necessary jurisdictional predicate after being challenged to do so. *See Gaines* at *2
(holding that "Although a request for dismissal of a case for lack of personal jurisdiction is
'inherently a matter requiring the resolution of factual issues outside the pleadings,' . . ., in their
response to the court's order to show cause, the plaintiffs did not provide any facts or evidence
connecting the defendant to New York in any way") (citations omitted); *Pablo Star* at *4
(holding that plaintiffs can overcome a challenge to personal jurisdiction "through the
submission of affidavits and supporting materials that contain 'an averment of facts that, if
credited, would suffice to establish jurisdiction over the defendant'") (citations omitted).

Here, Miller Bros. can demonstrate that Recom Corp. is subject to personal jurisdiction in
this district. As set forth above, Recom Corp. agreed to arbitrate in New York; participated in
the evidentiary hearings conducted here; and retained New York lawyers to assist it in New York
with briefing, oral arguments, and award-related motions in the arbitration proceedings. Under
such circumstances, courts have found that personal jurisdiction exists for litigation relating to
the arbitration. *See Credit Suisse Securities (USA) LLC v. Ebling*, 2006 WL 3457693 at *2
(S.D.N.Y. Nov. 27, 2006) (holding that that party who agrees to arbitrate in a particular
jurisdiction consents both to personal jurisdiction and venue in that jurisdiction); *see also
Doctor's Assocs. V. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996) (same); *Nat'l Union Fire Ins. Co. v.
Younger Bros.*, 2001 WL 669042, at *4 (S.D.N.Y. June 12, 2001) (by agreeing to arbitrate in
New York, party makes himself as amenable to suit as if he were physically present there).

In addition, jurisdiction over a defendant exists if it is engaged in a continuous and
systematic course of doing business in New York, warranting a finding of its presence in the
state. *See Skrodzki v. Marcello*, 810 F. Supp.2d 501, 507 (E.D.N.Y. 2011). Jurisdiction also
exists if the defendant transacted business in the state and the claim arose from that activity. *See*

**Buchanan Ingersoll & Rooney** PC
Attorneys & Government Relations Professionals

June 22, 2016
Page - 4 -

*id.* at 508. Here, Recom Corp. admits that it shipped goods to New York on at least one occasion. In addition, this action had its genesis at a meeting among the parties that took place at a trade show in New York City where Recom Corp. representatives first repudiated the delivery dates set forth in the Supply Agreement. Thus, should personal jurisdiction continue to be an issue, Miller Bros. reasonably anticipates that targeted discovery would confirm significant business activities by Recom Corp. in New York.

### B.     Venue Is Proper In This District.

Recom Corp. also contends that this action should be dismissed because this is not the proper forum. It asserts that the parties entered into a mandatory forum selection clause which specifies that judgment on the award may only be entered in New Jersey. Recom Corp. then cites a series of cases which it contends require the enforcement of such forum selection clauses. Recom is incorrect on all counts.

First, the FAA provides that "**If** the parties in their agreement have agreed **that a judgment of the court shall be entered upon the award** made pursuant to the arbitration, **and shall specify the court, then** . . . any party to the arbitration may apply **to the court so specified** for an order confirming the award." *See* 9 U.S.C. § 9 (emphasis added). Here, the parties' arbitration agreement is set forth in a clause entitled "Dispute Resolution," and that clause does not specify the court to be used for entry of judgment on an arbitration award as required by the first sentence of Section 9 of the FAA. However, the FAA envisions that such omissions are possible, and so it goes on to provide that "**If no court is specified in the agreement** of the parties, **then such application may be made** . . . in . . . the district within which such award was made." *See id.* (emphasis added). Since the Dispute Resolution Clause does not specify the court where judgment on the award should be entered, and since the S.D.N.Y. is the district where the award was made in this case, venue is therefore proper here under the FAA.

Despite the absence of language in the Dispute Resolution clause specifying the court where judgment must be entered, Recom Corp. contends that the parties specified elsewhere in the Supply Agreement that New Jersey courts are the exclusive venues for entering judgment on an arbitration award. Specifically, Recom Corp. points to the Supply Agreement's "Governing Law" section and contends that it mandates using New Jersey courts to confirm arbitration awards. *See* Supply Agreement at Section 23(a). However, Section 23(a) does no such thing.

Section 23(a) states that the Supply Agreement "shall be governed by and **construed and enforced** in accordance with the internal Laws . . . of . . . New Jersey." *See* Supply Agreement at Section 23(a) (emphasis added). It goes on to provide that each party accepts "the exclusive jurisdiction" of New Jersey courts and "waives any objection . . . to the bringing or prosecution of **any such action**." *Id.* (emphasis added). Thus, Section 23(a) applies only to litigation over the construction or enforcement of the Supply Agreement. It has nothing to do with the parties' agreement to arbitrate and certainly does not say anything about where judgments on arbitration awards must be entered. Therefore, the provisions of Section 23(a) are simply inapplicable.

**Buchanan Ingersoll ⟋ Rooney** PC
Attorneys & Government Relations Professionals

June 22, 2016
Page - 5 -

Furthermore, under the circumstances presented here, Recom Corp. plainly waived any forum selection rights that it claims to have. By their conduct, parties can waive the requirements of a forum selection clause. *See, e.g., Am. Int'l Grp. Europe S.A. (Italy) v. Franco Vago Int'l, Inc.,* 756 F. Supp. 2d 369, 380 (S.D.N.Y. 2010) (holding that a party waives forum selection rights when it voluntarily and intentionally abandons the enforcement of that right by affirmative conduct or by failure to act). That is precisely what Recom Corp. did here. It voluntarily agreed to arbitrate in New York, and it intentionally participated in hearings here, including by hiring New York lawyers to help defend the case and bring award-related motions.

Finally, none of the cases that Recom Corp. cites requires a different conclusion. The cases cited which involved post-arbitration proceedings all had arbitration agreements that expressly specified the forum for those proceedings. *See U.S. for Use of Fedelity and Deposit Co. of Maryland v. Suffolk Constr. Co.,* 2000 WL 10412 at *1 (S.D.N.Y. 2003) (agreement "specifically contemplated" that S.D.N.Y. would enter judgment on award); *Monte v. Southern Delaware County Auth.,* 321 F.2d 870, 871 (3d Cir. 1963) (agreement incorporated PA Arbitration Act, which limited review to state court); *John Ashe Assocs., Inc. v. Envirogenics Co.,* 425 F. Supp. 238, 240 (E.D. Pa. 1977) (agreement provided for entry of judgment on award only in California state court); *Zeevi Holding Ltd. v. Republic of Bulgaria,* 2011 WL 1345155 at * 1 (S.D.N.Y. Apr. 5, 2011) (agreement provided that execution on award could only be conducted in Bulgaria); *First State Ins. Co. v. National Cas. Co.,* 2013 WL 5439143 at * 3 (S.D.N.Y. Sept. 27, 2013) (agreement provided that any judicial proceeding for confirmation or vacatur of arbitration award had to be brought where arbitration was held). These cases are all inapposite because, as noted above, the Dispute Resolution Clause in the Supply Agreement did not contain similar express directions regarding the entry of judgments on an arbitration award.

### IV. <u>Conclusion</u>

Thus, for at least the reasons summarized above, Miller Bros. respectfully submits that this Court has the authority to assert personal jurisdiction over Recom Corp. and that venue properly lies in this district. Given that Miller Bros. has had only a limited opportunity to review Recom Corp.'s contentions and legal authorities, it also respectfully reserves the right to supplement its opposition as necessary or appropriate should Recom Corp. proceed to file a motion challenging the propriety of jurisdiction or venue in this Court.

Respectfully yours,

*Paul J Greco*

Paul J. Greco

cc:     Pieter Van Tol, Esquire (via electronic mail; with attachment)

# EXHIBIT A

# PURCHASE ORDER
# TERMS AND CONDITIONS

## Solar Module Supply Agreement

### Between

### Miller Bros. - a Division of Wampole-Miller, Inc.
("Contractor")

### and

### Recom, Corp.,
its parents, successors, affiliates, and assigns
("Vendor")

**Project Locations/ System Sizes ("Sites"):**

Site 1 – FRANKFORD (10 MW DC)   Branchville, NJ 07826 – **Sussex County**
Site 2 – BRICKYARD (2 MW DC)   Howell, NJ 07731 - **Monmouth County**
**Site 3** – HOLLAND (3.5MW DC) - Block 6, Lot 62, Township of Holland - Hunterdon County

**Purchase Order No. 312-0133-0521**



MB00001200



**MILLER BROS.**
DIV. OF WALPOLE HILL CO., INC.
**ELECTRICAL CONTRACTORS**

### TABLE OF CONTENTS

| SECTION | | PAGE NO. |
|---|---|---|
| 1. | SUMMARY AND ACCEPTANCE | 1 |
| 2. | COMPLETE AGREEMENT | 4 |
| 3. | DEFINITIONS | 4 |
| 4. | INVOICES/ PAYMENT | 8 |
| 5. | TRANSPORTATION | 8 |
| 6. | PACKING AND MARKING OF BOXES AND CRATES | 9 |
| 7. | FLASH   TEST   LISTS | 9 |
| 8. | FORCE MAJEURE | 9 |
| 9. | CUSTOMS   AND   DUTIES | 10 |
| 10. | PATENTS | 10 |
| 11. | EXCLUSIVE REMEDIES AND LIMITATIONS OF LIABILITY | 10 |
| 12. | COMPLIANCE WITH LAWS | 11 |
| 13. | TAXES | 11 |
| 14. | INDEMNIFICATION | 12 |
| 15. | PRODUCT WARRANTY AND DISCLSIMER | 13 |
| 16. | TITLE TO GOODS | 13 |
| 17. | ASSIGNMENT | 14 |
| 18. | INSURANCE | 14 |
| 19. | LATE DELIVERY PAYMENT | 14 |
| 20. | VENDOR'S DELIVERABLES | 15 |

MB00001201



21.    BILL OF LADING .......................................................................... 15

22.    VERBAL/ WRITTEN QUOTATIONS ............................................. 15

23.    GOVERNING LAW ....................................................................... 15

24.    CONFIDENTIALITY ..................................................................... 15

25.    REPRESENTATIONS AND WARRANTIES ................................. 16

26.    PUBLIC ANNOUNCEMENTS ...................................................... 16

27.    PROGRESS REPORTING ............................................................. 17

28.    TIME OF PERFORMANCE ........................................................... 17

29.    INSPECTION AND ACCEPTANCE ............................................. 17

30.    DISPUTE RESOLUTION .............................................................. 17

31.    ATTORNEY'S FEES ..................................................................... 18

32.    U.S. FOREIGN CORRUPRT PRACTICES ACT ........................... 18

33.    EVENTS OF DEFAULT ................................................................ 18

34.    GUARANTEED SHIPPING AND TERMINATION ...................... 20

35.    LENDER ACKNOWLEDGEMENT ............................................... 21

36.    MISCELLANEOUS ....................................................................... 21

<u>LIST OF EXHIBITS</u>

EXHIBIT A  SCOPE / PRICING AND PAYMENT SCHEDULE
EXHIBIT B  DELIVERY SCHEDULE
EXHIBIT C  MODULE SPECIFICATION DATA SHEET
EXHIBIT D  MODULE PACKAGING DETAILS
EXHIBIT E  VENDOR'S WARRANTY
EXHIBIT F INTELLECTUAL PROPERTY LICENSES FOR THE PV MODULES

Purchase Order Terms and Conditions            Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ❖ PH: (610) 832-1000 ❖ FAX: (610) 832-1005

3

MB00001202

1.   SUMMARY AND ACCEPTANCE

PROJECT NAME/ LOCATIONS/ SYSTEM SIZES:

Site 1 – FRANKFORD (10 MW DC)  Branchville, NJ 07826 – Sussex County
Site 2 – BRICKYARD (2 MW DC)  Howell, NJ 07731 – Monmouth County
Site 3 – HOLLAND (3.5MW DC) - Block 6, Lot 62, Township of Holland - Hunterdon County

BASIS OF DESIGN:
Current UL #1703 1000v UL Listed and Certified Solar Photovoltaic Poly Crystalline 72-Cell Photovoltaic Modules at 300Watts/ DC each, for installation in Optimized PV Systems Designed and Accepted for 1000v operation within the United States of America. (UL Certificate of Compliance: QIIA.E305171 - Photovoltaic Modules and Panels with System Voltage Ratings over 1000 Volts - to be provided by Vendor).

Total Purchase:  15.5MW DC SOLAR PHOTOVOLTAIC MODULES + 15.6 KW
MODULES = QTY. (40,052) MODULES

PRICE
Price Per Watt: USD $.68 Cents/ Watt including, but not limited to, any and all applicable taxes, duties, current or future applicable tariff fees, retroactive domestic & foreign trade embargos, duties, tariffs, penalties or fees, delivery, shipping costs and insurances – Delivered Duty Paid (DDP) individual jobsite paid by Vendor.

Total Purchase Price:  USD $10,550,608.00

PRODUCT SPECIFICATIONS
Positive Tolerance Modules 0% to +3% power tolerance Minimum.
Individual Module Bar Coded Serial Numbers, Flash Test Data & Specific Product Warranty forwarded to Miller Bros. for approval prior to any shipment from vendor and acceptance of delivery by Miller Bros.

TERMS
1.) Total Purchase Price: Ten million five hundred fifty Thousand Six Hundred and Eight ($10,550,608.00) US dollars
2.) Initial Purchase: 12.00156 MW DC for immediate availability per Delivery Schedule Exhibit B
3.) Initial Payment: Five (5%) percent of Initial Purchase
4.) Balance Payment – Balance of payment due within five (5) days after arrival of the modules at the port of NJ.
5.) Vendor shall be responsible for shipment and shipping charges to Sites.
6.) Cancellation Fee/ Break-up Fee of fifteen (15%) percent of the total Purchase Price to be paid by either party to the other should the other party for any reason cancel, default or fail to deliver on the terms of the agreement in the amount as stated herein.
7.) Late Delivery Payment. Subject to Exhibit B, attached and incorporated herein, if the Vendor fails to deliver Product as agreed on the delivery dates, interest will accrue equal to six hundred dollars (600 $) per working day and shall be paid to Contractor within thirty (30) days of Delivery Dates set forth in Exhibit B.
8.) Contractor shall have an option to purchase additional up to 10MW of additional Product at USD $.68 Cents/ Watt including, but not limited to, any and all applicable taxes, duties, current or future applicable tariff fees, retroactive domestic & foreign trade embargos, duties, tariffs, penalties or fees, delivery, shipping costs and insurances for a period of 3 weeks of the Effective Date of this PO Agreement.
9.) Importer of Record will be at any case Recom, Corp.

BANK WIRE TRANSFER INFORMATION

Bank Name: Bank of America
Address: 403 E Bidwell Street, Folsom, CA
Bank Contact/Custodian: _____

---

Purchase Order Terms and Conditions                              Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ❖PH: (610) 832-1000 ❖FAX: (610) 832-1005

MB00001203

Account # [Redacted]
Routing Number [Redacted]

CONTACT INFORMATION- DEPOSITS ONLY:

Miller Bros.
Ms. Danielle Mazza, CPA, CGMA, Controller
Miller Bros.- A Division of Miller Bros.- a Division of Wampole-Miller,
Inc. 610-832-1000 (Office)
dmazza@millerbros.us

Recom, Corp.
101 California Street, Suite 2710
San Francisco, CA 94111
Attention: Robert Benedict
Email: br@recom.gr
Phone: 415 365 7148

PURCHASE ORDER ACCEPTANCE:

IN WITNESS WHEREOF, the below parties have caused this Agreement to be executed by their duly
authorized representatives, to be effective as of the date of the last signature below;

| | |
|---|---|
| Miller Bros.- a Division of Wampole-Miller,<br>Inc. d/b/a Miller Bros. Electrical Contractors<br>301 Alan Wood Road | Recom, Corp.. ✗<br>101 California Street, Suite 2710<br>San Francisco, CA 94111 |
| | Signature: |
| Harry B. Miller III<br>President | Name: _LAERT TOUYAU_ |
| | Title: _CEO & CO-FOUNDER_ |
| Date: _June 5, 2014_ | Date: _June 5, 2014_ |

MB00001204

## 2.   COMPLETE AGREEMENT

This Purchase Order constitutes the complete agreement between the parties. No variation in any of the terms, conditions, deliveries, prices, quality, quantity or specification of this order, regardless of the wording of Vendor's acknowledgment shall be effective without Contractor's written consent. Acceptance of this offer is expressly limited to these terms. Contractor will not be responsible for any goods delivered without a properly executed purchase order unless otherwise provided herein, Vendor's execution of this Purchase Order or the delivery of any goods or the furnishing of any services in accordance with this order shall constitute acceptance by the Vendor of this Purchase Order subject to all its terms and conditions and a binding contract between Vendor and Contractor. The waiver by Contractor or Vendor of any rights under this Purchase Order in any one or more instances shall not constitute a waiver by Contractor or Vendor of any other right hereunder or of such rights on a future occasion.

## 3.   DEFINITIONS

"**Acceptance Procedures**" has the meaning set forth in Section 31.

"**Miller Bros.**" shall mean Miller Bros. - a Division of Wampole-Miller, Inc.

"**Applicable Law**" means all applicable laws, statutes, and ordinances, rules and regulations of any Governmental Authority.

"**Applicable Permits**" means all fabrication, construction and transportation permits, approvals, waivers, exemptions, variances, authorizations or orders required by any Governmental Authority that are required to be obtained or maintained, with respect to the Work only.

"**Applicable Standards**" means those sound and prudent practices, acts, methods, specifications, codes and standards of design, engineering, assembly, erection, installation, construction, performance, safety and workmanship prudently and generally engaged in or observed by the majority of the professional engineering and construction contractors performing engineering and construction services for major, grid-connected solar electric or wind generating facilities in the United States that, in the exercise of good judgment, would have been expected to accomplish the desired result in a manner consistent with Applicable Law, Applicable Permits, reliability, safety, environmental protection, local conditions, economy and efficiency.

"**Business Day**" means any Day except Saturday, Sunday, or a weekday that is observed by Owner as a holiday. As of the Effective Date, Owner's holidays are New Year's Day, Martin Luther King's Birthday, Good Friday, Memorial Day, Independence Day, Labor Day, Veterans Day, Thanksgiving Day, the Day following Thanksgiving Day, Christmas Eve Day, and Christmas Day. If there is any change in the holidays currently observed by Owner, Owner shall notify Contractor in writing.

"**Change**" shall mean a change in the Work or in the time for completion as delineated either on a drawing, in a specification, by instruction or a change in a term of the Contract or as more fully described in these definitions.

"**Completion**" shall mean the time at which all Work under this Contract is completed in accordance with the requirements of this Contract.

"**Contract**" shall mean this agreement between the Vendor and Contractor to perform the Work.

"**Contractor**" shall mean Miller Bros. - a Division of Wampole-Miller, Inc.

"**Contract Price**" shall mean the total sum of money stated in the Summary Terms - Price and payable by Contractor for the Work performed by the Vendor exclusive of value added taxes.

"**Delivery Schedule**" shall mean the detailed schedule prepared by Vendor for performance of the Work

MB00001205

attached hereto as Appendix 'B' and forming a part of this Contract.

"**Drawings**" shall mean the engineering and other graphic or pictorial documents or other presentations showing the design, location and dimensions of the Work.

"**Environmental Law**" shall mean any and all Laws and Codes relating to actual or potential effects on human health, safety, or the Environment of the activities under this Contract, the disposal of materials, the discharge or release of chemicals, gases, or other substances or materials into the Environment, or the presence of such materials, chemicals, gases, or other substances including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. Section 136 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq.; the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq.; the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 et seq.; the Oil Pollution Act, 33 U.S.C. Section 2701 et seq.; the Endangered Species Act, 16 U.S.C. Section 1531 et seq.; the National Environmental Policy Act, 42 U.S.C. Section 4321 et seq.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq. (to the extent relating to human exposure to Hazardous Material); the Homeland Security Appropriations Act of 2007, 109 P.L. 295; 120 Stat. 1355 (to the extent relating to the security of Hazardous Material); the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101 et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; Emergency Planning and Community Right-to-Know Act, 42 U.S.C. Section 11001 et seq.; and their state, tribal, and local counterparts or equivalents and regulations issued pursuant to any of those statutes.

"**Force Majeure**" shall have the meaning set forth in Section 7 of this Contract.

"**Good Industry Practices**" means those practices, methods, acts, techniques and standards as may be followed or employed at the time of performance of the Work, and which are generally accepted in the United States for use in the utility-scale photovoltaic solar electric power industry, in connection with facilities of the same or similar size and type as the Facility.

"**Intellectual Property**" means all intellectual property or other proprietary rights including all rights of inventorship and authorship, inventions, licenses, patents, patent applications and know-how for any product, process, method, machine, manufacture, design, composition of matter or any new or useful improvement thereof, as well as copyrights, trademark, trade dress and service mark rights and all rights in trade secrets, computer software, data and databases, calculations, and mask works.

"**Laws and Codes**" has the meaning set forth in Section 10 below.

"**Materials and Equipment**" includes materials, supplies, spare parts, apparatus, equipment, structures, machinery and other goods to be provided by Vendor as part of, or necessary for completion of, the Work and the performance of all of vendor's obligations under this Contract

"**Owner**" means Marina Energy, LLC.

"**Parties**" means Contractor and Vendor.

"**Product**" means the equipment specified in Exhibit C.

"**Project**" shall mean the Sites identified above, located in Monmouth and Sussex Counties, New Jersey.

"**Prudent Industry Practice**" means, with respect to each of the engineering, design, procurement, construction, operation, and maintenance of the Work, the practices, methods, and acts engaged in or approved by a significant portion of the solar photovoltaic power generation industry of the United States (including utilities and independent power producers) that at a particular time, in the exercise that reasonably should have been known at the time a decision was made, would have been expected to accomplish the

Purchase Order Terms and Conditions          Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ✦ PH: (610) 832-1000 ✦ FAX: (610) 832-1005

7

MB00001206

desired result in a manner consistent with Laws and Codes, this Contract, reliability, safety, environmental protection, economy, and expedition. Prudent Industry Practice is not intended to be limited to the optimum practice, method, or act, to the exclusion of all others, but rather is a spectrum of possible practices, methods or acts employed by contractors, including those involving the use of new concepts or technology, and having due regard for current editions of applicable electrical, safety and maintenance codes and standards, manufacturers' warranties, and Laws and Codes.

"**Purchase Order**" shall mean and include this Contract, (hereinafter "the PO").

"**Sites**" shall mean the job site(s) Sussex and Monmouth Counties, New Jersey identified in the Contract.

"**STC Watt**" means a watt of electrical energy measured using the Standard Testing Conditions, as defined by the California Energy Commission: 1,000 Watts per square meter solar irradiance, 25° C cell temperature, air mass equal to 1.5, and ASTM G173-03 standard spectrum.

"**Vendor**" shall mean Recom, Corp. 101 California Street, Suite 2710, San Francisco, CA 94111, its parents, subsidiaries, affiliates and assigns.

"**Warranty Period**" as defined in Section 14.

"**Work**" shall mean any equipment, good(s), supplies and services to be furnished and/or performed by the Vendor for the purpose of fulfilling the Contract, and shall include, without limitation, but only as applicable, the supply, consulting, design, manufacture, testing, quality assurance, repair, modification, upgrading, packing, transportation, erection, commissioning, servicing, the procurement of licenses, and the supply of certificates, manuals and spare parts all as are more particularly described in the Exhibits.

"**Work in Progress**" shall mean that part of a Vendor's inventory that is in the production process specifically for Contractor under this Purchase Order and has not yet been completed and transferred to the finished goods inventory.

4. INVOICES/PAYMENT

The original and two (2) copies of each invoice shall be submitted to the name and address stated in the Purchase Order. Separate invoices are required for each order and for each shipment. Contractor will pay the invoice amount Initial Payment of five (5%) of the Total Contract Price by wire transfer free of expense and to a Vendor-specified bank account within five (5) days of the later of receipt of an executed agreement and initial invoice. The remainder of the Invoiced Price per shipment will be paid five (5) days after delivery of products at the port. Late charges due on a current or previous shipment shall be paid by Contractor at one percent (1.0%) per month, or the highest rate permitted by law, whichever is less, unless waived in writing by Vendor. All payments shall be in US dollars.

Payment of invoices will be delayed unless the following has been received and accepted by the Contractor:

    a.   Invoice billed correctly, including reference to Project No., Purchase Order No., Sales term Named Place (e.g., DDP Destination, based on per INCOTERMS 2010), and cash discount terms.
    b.   The original transportation bills receipted by the carrier, if applicable.
    c.   Required Vendor supplied deliverables.
    d.   Flash Test and Serial Number Certification.
    e.   All equipment with required tagging and packing list.

Lien Releases. Prior to payment by Contractor of each Progress Payment (or portion thereof), Vendor shall: (a) certify to Contractor, and provide to Contractor sufficient documentation to establish that the Product, the Project, the Project Site and any and all interests and estates therein, and all improvements and Materials placed on the Project Site, are free from any and all claims for payment, liens, security interests or encumbrances in the nature of mechanics', labor or materialmen's liens or otherwise, arising out of or in connection with this Agreement or performance by Vendor of the Agreement; and (b) provide copies of such

Purchase Order Terms and Conditions            Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ✦PH: (610) 832-1000 ✦FAX: (610) 832-1005

8

MB00001207

releases and waivers from Subcontractors as are necessary to support Vendors certificate.

All invoices for final payment must be accompanied by a fully executed final lien waiver indicating a complete release of any third party liens which may be filed in connection with the work hereunder. If progress payments are applicable, a partial lien waiver must be sent with each invoice and a final lien waiver sent with the final invoice.

5.   TRANSPORTATION

The Parties mutually agree to the following delivery dates: Shipment Schedule (See Exhibit "B") the "Delivery Schedule".

Vendor shall not be required to accelerate its Contractor-approved scheduled delivery without mutual agreement between Vendor and Contractor. If such changes cause an increase or decrease in the cost of the delivery of the work or in the required time for its performance, an equitable adjustment shall be made through a Change Order.

Transportation and shipping must be prepaid by Vendor on all shipments (**collect shipments _are not_ acceptable).**

Unless otherwise specified, the price for goods and services includes all charges for packaging, boxing, crating and cartage and all shipments shall be DDP Individual Project Sites, (New Jersey), based on per INCOTERMS 2010. Goods must be shipped as per instructions in this order; otherwise any extra handling charges will be billed back to Vendor.

The Vendor will advise Contractor of the name of the carrier, the waybill or pro number, truck or rail car number, date and place of origin of each shipment and the anticipated arrival date at the Delivery Point. This data shall be emailed, faxed or couriered to the Site and to the Contractor prior to shipment.

6.   PACKING AND MARKING OF BOXES AND CRATES

The goods shall be properly packaged for shipment as detailed in Exhibit D. Packing must ensure complete safety of all equipment from damage caused by corrosion, impact or penetration during transport to include any micro- cracks/ fissions created during the shipping process.

Vendor shall ensure that the equipment is sufficiently prevented from moving or shifting within the packing case or box so that the equipment does not vibrate, collide or chafe with other supplies or with the packing case or box. All items shall be prepared for shipment to prevent damage and deterioration in transfer and in field storage. This specifically includes plugging all threaded openings with plugs. Damaged Product that is received on Site shall be replaced by the Vendor at no cost to the Contractor and shall be re-delivered to the site so as not to impede the progress of the project.

The Vendor shall repair or replace equipment free of charge where it can be shown that deterioration or damage has resulted from inadequate packaging or marking on the part of the Vendor. Any charges resulting from improper packing or loading will be to the Vendor's account and will delay final payment.

Each package shall be numbered and labeled with Contractor's order number, project number, equipment number, instrument tag number, contents and weight, and shall contain an itemized packing slip. One copy of the Packing List shall be faxed or couriered to the Project Site and to the Contractor in advance of shipment.

7.   FLASH TEST LISTS

Vendor shall provide the Contractor, on the Shipping Date, the Flash Test List identifying the Product being shipped. Such Flash Test Lists shall be delivered via electronic mail in a reasonably acceptable format to Contractor's representative in the Purchase Order and shall specify the module area efficiency, which for all Products shall be greater than the minimum Agreed Efficiency, for the Products being shipped. Notwithstanding any other term of this Agreement or any Purchase Order, the Vendor agrees to only supply

MB00001208

Products that have tested in Vendor's facility to a positive 0% to +3% power tolerance evidenced by the Flash Test Lists accompanying such Products. Vendor shall promptly replace any such Rejected Products by Delivering conforming Products to Contractor at the Delivery Point, and Vendor shall be responsible for all costs, including the costs of materials, transportation to and from the Delivery Point, labor, equipment, removal and shipment resulting from the rejection of any Products by Contractor. Rejected Products shall not be considered Delivered and shall be subject to replacement by the Vendor.

8.   FORCE MAJEURE.

As used in this Contract any acts, events, or occurrences that are unforeseeable and not caused by the negligence or willful misconduct of the affected Party or any of its Personnel and are beyond the reasonable control of such Party or any of its Personnel may be considered Force Majeure Events. Depending upon the facts and circumstances, the following may be a Force Majeure Event: acts of God; earthquakes; unusually severe weather conditions; unusually severe drought; blight; famine; quarantine; blockade; governmental acts, inability to obtain Permits despite due diligence in seeking such Permits; court orders or injunctions; war; insurrection or civil strife; sabotage; terrorism; pandemic and explosions; provided, however, that a Force Majeure Event does not include (i) economic hardship, such as the inability to pay monies due and owing, or (ii) a failure of materials and equipment except if caused by an independent event constituting a Force Majeure Event, (iii) acts or omissions of a third party, including any Vendor or Subcontractor, unless such acts or omissions themselves result from a Force Majeure Event, (iv) unavailability of materials and equipment except if caused by an independent event constituting Force Majeure Event, (v) a strike, walkout, or other dispute of Contractor's or Owner's Personnel at the Project Site or (vi) price fluctuation with respect to materials and equipment. In no event shall Vendor be responsible for any taxes, levies and assessments imposed by any Governmental Authority outside of the United States, export and import duties (including without limitation, those assessed by or in the United States, including any anti-dumping countervailing duties, the posting of any bond or collateral required, or other trade related levies imposed on either Contractor or Vendor), and taxes, levies or other charges or costs that may be assessed on or incurred in connection with the sale, exporting, importing and transportation of the Products to the Delivery Point, or the unavailability or shortage of skilled or unskilled labor constitute a Force Majeure Event.

9.   CUSTOMS AND DUTIES.

Vendor shall pay any and all sales, property, services and use or value added taxes, related to the purchase of the Products imposed by any Governmental Authority in the United States. Vendor shall be responsible for any taxes, levies and assessments imposed by any Governmental Authority outside of the United States, export and import duties (including without limitation, those assessed by or in the United States, including any anti-dumping, countervailing duties, the posting of any bond or collateral required, or other trade related levies imposed on either Contractor or Vendor), and taxes, levies or other charges or costs that may be assessed on or incurred in connection with the sale, exporting, importing and transportation of the Products to the Delivery Point. If any charges are entitled under law to an exemption from sales or use tax liability, Contractor agrees to provide Vendor with evidence of tax exemption acceptable to the relevant taxing authority and Vendor agrees to transmit such evidence as may be permitted by law.

10.   PATENTS

Vendor will: (i) defend, indemnify and hold harmless the Owner and the Contractor from and against any and all liability, loss and expenses including reasonable attorney's fees by reason in the event any claim against Contractor or Owner alleging that any Product supplied hereunder directly infringes any patent, copyright or trademark or misappropriates any third party trade secret; and (ii) reimburse Contractor for any reasonable costs incurred at Vendor's written request relating to such claim.

In addition, in connection with satisfying its obligations under this Section, Vendor shall have the right but not the obligation, at any time and at its option and expense to: (i) procure for Contractor the right to continue using such Product; (ii) replace or modify any such Product provided or to be provided so that it is free of this infringement; or
(iii) require return of such Product and shall refund the purchase price paid by Contractor.

MB00001209

Notwithstanding the foregoing, Vendor shall have no obligation to defend or settle any claim: (i) arising from Vendor's compliance with Contractor's specifications, designs or instructions; or (ii) arising from the combination of Product furnished hereunder with other product(s) or item(s), whether or not furnished by Vendor, provided such infringement would not have occurred but for the combination.

Contractor will defend or settle, at its option and expense, any claim against Vendor alleging infringement of any patent, copyright or trademark, or misappropriation of any trade secret, arising from (i) Vendor's compliance with Contractor's specifications, designs or instructions, or (ii) the combination of Product furnished hereunder with other product(s) or item(s), whether or not furnished by Vendor, unless the infringement would have occurred without the combination. In connection with any such claim, Contractor shall reimburse Vendor for any reasonable costs incurred at Contractor's written request relating to such claim, and pay damages and costs assessed by final judgment against Vendor and attributable to such claim.

In addition, in connection with satisfying its obligations under this Section, Contractor shall have the right but not the obligation, at any time and at its option and expense to: (i) procure for Vendor the right to continue using such Product in compliance with Contractor's specification, designs or instruction; (ii) replace or modify any such specifications, designs or instruction provided or to be provided so that it is free of this infringement; or (iii) return of such Product with no refund.

The obligations to indemnify the other party under this Section are conditioned upon: (i) the party requesting indemnification hereunder ("Indemnitee") giving written notice within thirty (30) days of any such claim to the other party ("Indemnitor"); (ii) the Indemnitor having complete control of the defense and settlement thereof; (iii) Indemnitee cooperating fully with Indemnitor to facilitate the defense or settlement of such claim; and (iv) Indemnities' substantial compliance with this Agreement.

**The foregoing states the sole and exclusive remedy and obligation of the Parties hereto for infringement or other violation of any Intellectual Property rights arising hereunder and is in lieu of all warranties, express, implied or statutory, in regard thereto.**

11. EXCLUSIVE REMEDIES AND LIMITATIONS OF LIABILITY

EXCEPT AS EXPRESSLY SET FORTH HEREIN, VENDOR'S AND CONTRACTOR'S TOTAL LIABILITY ARISING FROM THE PRODUCTS AND/OR SERVICES, WHETHER FOR BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHERWISE, WILL BE LIMITED TO ACTUAL DAMAGES, EXCEPT SUCH LIMITATION SHALL NOT APPLY TO THE VENDOR BREAK-UP FEE OR CLAIMS ARISING UNDER SECTION 14, PATENT INDEMNIFICATION AND ANY CLAIMS ARISING FROM VENDORS WILLFUL MISCONDUCT OR FRAUD. IN NO EVENT SHALL VENDOR BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT LIQUIDATED OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THE PRODUCTS AND/OR SERVICES, REGARDLESS OF WHETHER VENDOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND WHETHER ARISING OUT OF DESIGN OR MANUFACTURING DEFECT, NEGLIGENCE, BREACH OF WARRANTY, STRICT LIABILITY, DEFAULT, INDEMNITY OR ANY OTHER REASON OR LEGAL THEORY ARISING OUT OF THE USE OR HANDLING OF IT'S PRODUCTS OR IT'S PERFORMANCE UNDER THESE TERMS.

12. COMPLIANCE WITH LAWS

Vendor represents and warrants that no Federal or State statute or regulation, or municipal ordinance, has been or will be knowingly violated in the manufacturing, sale, and delivery of any article or service sold and delivered hereunder and if such violation has or does occur, Vendor will indemnify and save harmless the Owner, the Contractor, and their representatives from all loss, penalties, or the payment of all sums of money on account of such violation. Vendor further guarantees that all equipment furnished by Vendor in performance of this Purchase Order will comply fully with the Williams Steiger Occupational Safety and Health Act of 1970, as amended to date,

and rules and regulations promulgated in conformity with the Act to date, including any State regulations adopted for a State pursuant to OSHA, to the extent applicable to such equipment, and Vendor shall

Purchase Order Terms and Conditions                    Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428  ✳PH: (610) 832-1000  ✳FAX: (610) 832-1005

11

MB00001210

indemnify the Owner, the Contractor, and their representatives from and against any and all claims, loss, or liability arising from failure of such equipment to comply herewith.

Each Party covenants to the other that during the term of this Contract it will comply at all times with all Laws and Codes necessary for its performance under this Contract, or, in the event of any alleged continuing non-compliance, diligently contest any allegations of non-compliance with such Laws and Codes in good faith. by appropriate proceeding to the extent permitted without material adverse effect on that Party's performance under this Contract; and give all required Notices, and procure, maintain, and comply with all applicable Permits necessary for the performance of its obligations under this Contract; and pay all charges and fees in connection therewith. "Laws and Codes" means all applicable federal, foreign, state, and local laws, treaties, ordinances, codes, rules and regulations, judgments, decrees, injunctions, writs and orders, in effect from time to time, of any arbitrator or Governmental Authority, including all Permits, Industry Codes and Standards, and all other generally recognized building and safety standards governing performance of the Work.

13. TAXES

The Contract Price shall include all foreign, federal taxes (including but not limited to property, license, franchise, excise, gross receipts, value added, import or export duties or fees, or withholding) that may now or hereafter be imposed (i) on Contractor or Vendor, (ii) on the Work performed by Vendor, (iii) on the exportation of Materials and Equipment from another country to the United States or the importation of Materials and Equipment into the United States, or (iv) on any Materials and Equipment provided by Vendor hereunder, except for sales and use tax imposed by the State of New Jersey on the Materials and Equipment ("New Jersey Sales and Use Taxes").

   a) New Jersey Sales and Use Taxes. Contractor shall provide to Vendor either (i) an exemption from payment for any New Jersey Sales and Use Taxes on Materials and Equipment delivered to New Jersey, or (ii) proof of payment of New Jersey Sales and Use Taxes in the form of an affidavit from the Contractor stating the amount of use tax paid and the month the use tax was paid directly to the New Jersey Department of Taxation. Contractor shall, in accordance with Applicable Law, timely administer and timely pay all New Jersey Sales and Use Taxes that are included in the Contract Price and timely furnish to the appropriate taxing authorities all required information and reports in connection with such Taxes and furnish copies of such information and reports (other than information specifically pertaining to Contractor's income and profit) to Vendor as reasonably requested by Vendor.

   b) Excluded Taxes. For the avoidance of doubt, the Contract Price excludes (a) Property Taxes and (b) any Taxes imposed on Owner by any Governmental Authority under Applicable Law ("Excluded Taxes"), in all cases which shall be the sole responsibility of, and payable by Owner.

   c) Contractor and Owner to Cooperate. Contractor and Owner shall reasonably cooperate with each other and Vendor to minimize the Tax liability of all Parties to the extent legally permissible, including separately stating taxable charges on Contractor's Invoices and supplying resale and exemption or exclusion certificates and other information as reasonably requested in all cases by taxing authorities. In addition, to the extent any exemptions, abatements, credits against or deferrals of any Taxes may be available to Owner or Contractor under Applicable Law, the Parties shall reasonably cooperate in order to secure any such exemptions, abatements, credits against, or deferrals of, such Taxes.

14. INDEMNIFICATION

To the fullest extent permitted by law, and without limiting any indemnification otherwise provided at law or in equity, each Party (the "Indemnitor") will fully protect, indemnify, defend and hold harmless the other Party (the "Indemnitee") (including its directors, officers, employees, its Affiliates, (and their directors, officers, and shareholders), (each, a "Representative")) for, from and against all actions and their direct costs, expenses and damages arising out of or resulting from, either directly or indirectly any of the following (and regardless of whether such costs, expenses, or damages are caused in part by any act, omission, or active or passive negligence of the Indemnitees) (a "Claim"):

MB00001211

a) Any actual or alleged loss or damage to property of, or injury to or death of, any third party caused wholly or partially by any negligent act, or willful misconduct of the Indemnitor or any Indemnitor Representatives, in connection with the performance or nonperformance of obligations under this Agreement or any materials provided by Indemnitor hereunder;

b) The actions, or failure to act by Indemnitor's agents, brokers, finders or representatives, or any conflicts between Indemnitor's agents, brokers, finders or representatives and Indemnitor;

c) Indemnitor's failure to pay any and all sales, excise, privilege, gross receipts, use, compensation and like taxes or assessments, now or hereafter imposed or levied by New Jersey, or any city, town, county, or other political division thereof, or any other applicable tax authority, in connection with the Contract or the Product performed;

d) Indemnitor's failure or refusal to pay any applicable duties, tariff or countervailing duties imposed on the Product, whether retroactively or prospectively by any Authority Having Jurisdiction.

e) Indemnitor's failure to pay any and all taxes and contributions for unemployment insurance, retirement benefits, life insurance, pensions, annuities and any other benefits now or hereafter imposed by law or collective bargaining contracts with respect to persons employed by Indemnitor in connection with the Contract or any materials supplied hereunder; Indemnitor's failure to comply with all Applicable Laws;

f) Any claim of any third party engaged by Indemnitor in connection with the satisfaction of Indemnitor's obligations hereunder.

g) Any lien by any Vendor or other entity or person supplying labor, Equipment, Services, or Materials related to the Product; or

h) The presence, uncovering, or release of suspected or confirmed Hazardous Substances brought on site by the Vendor whether caused wholly or partially by the negligence or willful misconduct of or the failure to comply with the terms and conditions of this Agreement by the Vendor or any entity or person for whom any of them is responsible.

Vendor's Indemnification for Intellectual Property Claims. Vendor shall fully indemnify, hold harmless and defend Contractor Indemnitees from and against any and all damages which Contractor may suffer or pay by reason of any Actions arising out of claims of infringement of any domestic or foreign patent rights, copyrights or other Intellectual Property, proprietary or confidentiality rights with respect to materials and information designed or used by Vendor. If, in any such suit or claim, a temporary restraining order or preliminary injunction is granted, Vendor shall make every reasonable effort, by giving a satisfactory bond or otherwise, at Vendor's sole cost and expense, to secure the suspension of the injunction or restraining order as soon as possible. If, in any such suit or claim, the Product, or any part, combination or process thereof, is held to constitute an infringement and its use is permanently enjoined, Vendor shall promptly make every reasonable effort to secure for Contractor a license, at no cost to Contractor, authorizing its continued use of the infringing Product. If Vendor is unable to secure such license within a reasonable time, Vendor shall, at its own expense and without impairing performance requirements, either replace the affected Product or part, combination or process thereof with non-infringing components or parts or modify the same so that they become non-infringing. This provision expressly survives the termination of this Agreement.

15. PRODUCT WARRANTY AND DISCLAIMER.

25 Year Linear Power
Warranty 10 Year
Manufacturer's Warranty

PRODUCTS SHALL BE SUBJECT TO THE WARRANTY SET FORTH IN EXHIBIT E; PROVIDED,

MB00001212

HOWEVER, THAT CONTRACTOR ACKNOWLEDGES AND AGREES THAT IF (AND FOR AS LONG AS) CONTRACTOR IS IN BREACH OF SECTION 4, VENDOR SHALL HAVE NO OBLIGATION TO COMPLY WITH THE WARRANTY SET FORTH IN EXHIBIT E. THE EXPRESS REMEDIES SET FORTH HEREIN AND PROVIDED BY VENDOR ARE THE SOLE AND EXCLUSIVE REMEDIES FOR ANY BREACH OF REPRESENTATION OR WARRANTY, AND THE EXPRESS WARRANTIES PROVIDED HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE PRODUCTS ARE PROVIDED "AS IS".

General Warranty of Work. Vendor hereby warrants to Contractor that:

    a)   the Work furnished and performed under this Contract by Vendor shall be furnished and performed to:

        (i)   Prudent Industry Practice;

        (ii)   professional standards and with the accuracy, care, and skill customarily expected in connection with comparable projects in the electric generation industries and general industrial construction industries; and

        (iii)   shall be in compliance with all Laws and Codes;

    b)   the Work will conform to the requirements of this Contract, including Permits related to Environmental Laws, and will be free from Defects in materials and workmanship;

    c)   all Materials and Equipment will be new and free from Defects in materials and workmanship; and

    d)   the Materials and Equipment meet the standards and requirements set forth in this Contract.

WARRANTY ON CORRECTED WORK. ANY DEFECT REPAIRED, REPLACED, OR OTHERWISE CORRECTED BY PURCHASER (OR BY OWNER OR A MUTUALLY ACCEPTABLE THIRD PARTY AT CONTRACTOR'S EXPENSE) PURSUANT TO THIS ARTICLE 16 SHALL BE WARRANTED BY VENDOR FOR A PERIOD OF TIME FOLLOWING THE DATE OF SUCH REPERFORMANCE, REPAIR, OR REPLACEMENT EQUAL TO THE LONGER OF (I) THE REMAINDER OF THE WARRANTY REMEDY PERIOD OR (II) ONE (1) YEAR FROM THE DATE OF SUCH REPERFORMANCE, REPAIR, OR REPLACEMENT.

VENDOR WARRANTIES FOR CONTRACT SUBCONTRACTORS. VENDOR SHALL, FOR THE PROTECTION OF PURCHASER AND OWNER, OBTAIN FROM ALL SUB VENDORS AND LOWER TIER SUBVENDORS, AND THEREAFTER ENFORCE ALL WARRANTIES (AND REMEDIES) WITH RESPECT TO WORK AND MATERIALS AND EQUIPMENT THAT ARE THE AT LEAST AS PROTECTIVE OF OWNER AS THE WARRANTIES PROVIDED BY SUBVENDOR TO VENDOR. THE WARRANTY PERIODS FOR SUCH WARRANTIES SHALL EXTEND FOR AT LEAST AS LONG AS THE WARRANTY REMEDY PERIOD SET FORTH IN SECTION 13.2 (PERIODS) IN ALL CASES. ALL VENDOR CONTRACTS THAT PROVIDE FOR A WARRANTY LONGER THAN THE WARRANTY REMEDY PERIODS IN THIS CONTRACT SHALL BE ASSIGNED TO OWNER UPON FINAL ACCEPTANCE.

16.  TITLE TO GOODS

Condition. To the extent Contractor's payments to Vendor are made in accordance with this Contract, Vendor warrants good title, free and clear of all liens, claims, charges, security interests, and encumbrances whatsoever (other than those created by Contractor, any third-party (other than a Subcontractor or Affiliate of Vendor or any of its subcontractors) or that result from Owner's failure to pay Excluded Taxes hereunder), to all Product, Work, Project Hardware and other items furnished by Vendor or any of the Subcontractors that become part of the Project or that are to be used for the operation, maintenance or repair thereof.

Transfer. Title to the Product and other items that become part of the Project as part of Vendor's Work shall

MB00001213

pass to Owner payment (less any retainage or off-set).

Custody during Performance. Contractor shall have care, custody and control of all Product and other items that become part of the Project and exercise due care with respect thereto until the earlier of (a) the Substantial Completion Date, and (b) the termination of this Agreement and payment by Owner to Contractor of all amounts owing thereunder.

Risk of Loss

 a) Risk of Loss Before Substantial Completion. Until the Substantial Completion Date (except to the extent otherwise provided herein upon the earlier termination of this Agreement), Contractor assumes risk of loss and, without limitation of its right to make claims for relief elsewhere in this Agreement, full responsibility for the cost of replacing or repairing any damage to the Work, the Project or any portion thereof (including Project Hardware) caused by Contractor or its subcontractors.

 b) Risk of Loss After Substantial Completion Date. Risk of loss to the Project shall pass to Owner from and after the Substantial Completion Date (or the earlier termination of this Contract), unless such loss or damage
 (a) is caused by Contractor, a Subcontractor or a party over whom Contractor has control or any Affiliate of Contractor or (b) is covered by the Warranties provided by Vendor pursuant to Exhibit E.

17. ASSIGNMENT

Vendor consents to an assignment of this Purchase Order to Owner, for no additional consideration, which assignment shall be effective upon written notice to the Vendor by Owner. This Purchase Order shall not be assigned by Vendor without the prior written consent of Contractor. Any assignment of this Purchase Order by Vendor, in whole or in part, voluntarily, by operation of law, or otherwise, without the prior written consent of Contractor, shall be void.

18. INSURANCE

Complete insurance coverage for the Vendor's delivery, start-up or service personnel entering on the property or premises of the Owner/Contractor will be carried by the Vendor's subcontractor, ie. its freight forwarding logistics company in amounts satisfactory to Contractor. This includes public liability and property damage insurance with contractual liability endorsement and such insurance of employees as may be required by any workmen's compensation act or other law, regulation or ordinance, which may apply on the premises. Insurance certificates must be submitted by Vendor's subcontractor, ie. its freight forwarding logistics company to Contractor prior to entering on Owner's/Contractor's property. Vendor's subcontractor, ie. its freight forwarding logistics company is required to carry the following insurance (limits shown):

**Commercial General Liability:**

| | |
|---|---|
| Bodily Injury and Property Damage | $2,000,000 per occurrence |
| General Aggregate | $2,000,000 |
| Personal Injury | $1,000,000 |
| Fire Damage | $ 100.000 |
| Auto Liability | $2,000,000 |

**Excess Liability/Unbrella**

| | |
|---|---|
| General Aggregate | $5,000,000 |
| Per Occurrence | $5,000,000 |

| | |
|---|---|
| **Professional Liability** | $5,000,000 |

19. LATE DELIVERY PAYMENT

The Vendor must deliver the Products according to the Delivery Schedule as specified in Exhibit B to this Purchase Order. If the Vendor fails to deliver Product as agreed on the delivery dates, interest will

Purchase Order Terms and Conditions                    Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 * PH: (610) 832-1000 * FAX: (610) 832-1005
                                                                        15

MB00001214

accrue equal to six hundred dollars (600 $) per working day and shall be paid to Contractor within thirty (30) days of Delivery Dates set forth in Exhibit B.

20.   VENDOR'S DELIVERABLES

Vendor agrees to supply an electronic copy of Vendor's User Manual to Contractor at time of initial delivery. The following data is to appear on all Vendor documents, as well as all written communications from the Vendor:

    a) Module Manufacture

    b) Solar PV Project Name

    c) Delivery Location

    d) Wampole-Miller Inc.

    e) Purchase Order No.

21.   BILL OF LADING

The Vendor will furnish a Bill of Lading to Contractor by fax and with shipment of Product.

22.   WRITTEN QUOTATIONS

Pricing structures or written pricing used in a formally issued purchase order shall not be revised. Failure to adhere to this policy shall immediately cancel the purchase order in question.

23.   GOVERNING LAW

a)   Choice of Law; Choice of Forum This Contract, and all amendments and modifications hereof, and all documents and instruments executed and delivered pursuant hereto or in connection herewith, shall be governed by and construed and enforced in accordance with the internal Laws and Codes of the State of New Jersey, without regard to its principles of conflict of laws. Each Party accepts, generally and unconditionally, the exclusive jurisdiction of the aforesaid state and federal courts. Each Party irrevocably waives any objection (including any objection based upon the grounds of "forum non conveniens") that it now or hereafter may have to the bringing or prosecution of any such action or proceeding with respect to this Contract or the documents and instruments contemplated hereby in the State of New Jersey. Each Party hereby irrevocably consents to the service of any and all process in any action or proceeding by mailing a copy of such process to such Party at the address for such Party set forth in this Contract.

b)   Waiver of Jury Trial.   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS CONTRACT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS A PARTY MAY HAVE
TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION RESULTING FROM, ARISING OUT OF OR RELATING TO THIS CONTRACT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

24.   CONFIDENTIALITY

a)   Disclosure. Each party may disclose to the other party certain Trade Secrets and Confidential Information of such party or of such party's associated companies, distributors, licensors, suppliers, or customers. For purposes of this Agreement, "Trade Secrets" means information that is a trade secret under law; "Confidential Information" means information, other than Trade Secrets, that is of

MB00001215

value to its owner and is treated as confidential; "Proprietary Information" means this Agreement, Trade Secrets and Confidential Information; the "Disclosing Party" refers to the party disclosing Proprietary Information hereunder, whether such disclosure is directly from Disclosing Party or through Disclosing Party's employees or agents; and "Recipient" refers to the party receiving any Proprietary Information hereunder, whether such disclosure is received directly or through Recipient's employees or agents.

b) **Requirement of Confidentiality.** Recipient agrees to hold the Proprietary Information disclosed by Disclosing Party in confidence and not to, directly or indirectly, copy, reproduce, distribute, manufacture, duplicate, reveal, report, publish, disclose, cause to be disclosed, or otherwise transfer the Proprietary Information disclosed by Disclosing Party to any third party, or utilize the Proprietary Information disclosed by Disclosing Party for any purpose whatsoever other than as expressly contemplated by this Agreement. Contractor acknowledges that the existence of this Agreement and the pricing information set forth herein and on Vendor's invoice(s) is Proprietary Information of Vendor. With regard to the Trade Secrets, the obligations in this Section shall continue for so long as such information constitutes a trade secret under applicable law. With regard to the Confidential Information, the obligations in this Section shall continue for the term of this Agreement and for a period of five years thereafter. The foregoing obligations shall not apply if and to the extent that: (i) Recipient establishes that the information communicated was publicly known at the time of Recipient's receipt or has become publicly known other than by a breach of this Agreement; or (ii) Recipient is ordered by an administrative agency or other governmental body of competent jurisdiction to disclose the Proprietary Information. All communication, offers and statements, whether oral or written, and documents and other writings exchanged between the Parties in connection with the management negotiations referenced above or the mediation under this agreement shall be confidential and shall not be discoverable, admissible in evidence or used or referred to in any subsequent binding adjudicatory process between the Parties; provided, however, that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in such negotiations.

## 25. REPRESENTATIONS AND WARRANTIES

**Representations and Warranties of Both Parties.** Each Party, as a material inducement to the other Party's entering into this Contract, represents and warrants to the other Party that:

a) there are no suits, proceedings, judgments, rulings, or orders by or before any Governmental Authority or arbitrator pending or to the best of the Party's knowledge threatened action or proceeding affecting the Party before any Governmental Authority or arbitrator that could reasonably be expected to materially and adversely affect the financial condition or operations of the Party or the ability of the Party to perform its obligations hereunder, or which purports to affect the legality, validity, or enforceability of this Contract (as in effect on the Effective Date);

b) it is a duly organized and validly existing entity of the type described in the recital clauses of this Contract, is in good standing under the Laws and Codes of the jurisdiction of its formation;

c) it has the legal right, power, and authority and is qualified to conduct its business, and to execute and deliver this Contract and perform its obligations under this Contract, subject to receipt of necessary regulatory authorizations;

d) all regulatory authorizations have been obtained and will be maintained or, if not obtained by the Effective Date, such Party will use its reasonable good faith efforts to obtain and thereafter shall maintain such regulatory authorization in each case, as necessary for it to perform legally its obligations under this Contract as such obligations become due;

e) its making and performing of this Contract is within its powers, has been duly authorized by all necessary action on its part, and does not and will not violate any Laws and Codes presently in effect and applicable to it or its governing documents; and

f) this Contract constitutes its legal, valid, and binding act and obligation, enforceable against it in accordance with this Contract's terms, subject to applicable bankruptcy, insolvency, or reorganization

MB00001216

laws, and other Laws and Codes affecting creditors' rights generally, and general equitable principles, to the discretion of the Governmental Authority before which proceedings to obtain the same may be pending.

26. PUBLIC ANNOUNCEMENTS

Vendor shall not make any public announcements regarding this Agreement or the transactions contemplated hereby for any purpose whatsoever, including, but not limited to marketing, sales, internal references or recommendations, without Miller Bros.' prior written approval, which approval shall not be unreasonably withheld or delayed. Miller Bros. shall not make any public announcements regarding this Agreement or the transactions contemplated hereby that name Vendor without Vendor's prior written approval, which approval shall not be unreasonably withheld or delayed. In no event will such public announcements disclose pricing or any other confidential information. The Parties shall consult with each other as to the form, substance and timing of any desired press release or other public disclosures related to this Solar Module Supply Agreement or the transactions contemplated hereby and no such press release or other public disclosure shall be made without the consent of the other Party, which consent shall not be unreasonably withheld or delayed; provided, however, that the Parties may make such disclosures to the extent permitted herein above or to the extent required by applicable law, legal process or court or governmental order, including the requirements of applicable securities exchange governing bodies, in the United States of America, if applicable.

27. PROGRESS REPORTING

Vendor shall, if requested by Contractor, provide a schedule defining procurement, fabrication, and delivery activities. If requested, the schedule shall be updated and issued to Contractor weekly.

28. TIME OF PERFORMANCE

Time is of the essence in the performance of each provision of this Agreement.

29. INSPECTION AND ACCEPTANCE

a)   **Facility Inspection.** Prior to Vendor's delivery of Product to the Delivery Point, Contractor shall have the right to inspect Vendor's manufacturing facilities, provided that Contractor provides ten (10) business days written notification ("Facility Inspection"). Facility Inspection may include Contractor or Contractor's authorized representatives, subject to safety, confidentiality, and security measures in place at Vendor's Manufacturing Facility, conducting an inspection of the in-process manufacturing, final tests and container packaging operations. The Facility Inspection procedure must be approved by both Parties in writing prior to date of inspection. Notwithstanding anything to the contrary herein, (a) in no case shall Vendor be obligated to reveal or disclose to Contractor any of its know-how, Trade Secrets, or other proprietary processes and/or materials.

b)   **Delivery Inspection.** Upon each delivery of any Modules to the Project site, Contractor (or its representatives) shall within five (5) days of such delivery visually inspect two (2) containers thereof for damage from shipping. Contractor may reject the containers if, after visual inspection thereof, it appears in Contractor's reasonable judgment that any portion thereof has been damaged. If Contractor rejects the containers as damaged as provided in the preceding sentence, Vendor shall replace the damaged modules in a subsequent delivery. If Contractor rejects the containers in the final delivery, Vendor shall replace the rejected modules and deliver the replacement modules within thirty (30) Days after Contractor's written notice of rejection. Upon any notice of rejection of the containers for damage, Contractor shall have no further responsibility for the rejected modules other than to move such modules to the primary loading and unloading location on site, and to take reasonable precautions to protect such modules until they are removed by Vendor. Vendor shall promptly arrange for such rejected modules to be removed from the Project site, and title to such rejected modules shall revert to Vendor upon Vendor's (or its agents) removal thereof from such site. Contractor may also within five (5) days report hidden damage. The inspections and verifications listed above constitute Contractor's acceptance procedures (the

**Purchase Order Terms and Conditions**                   **Purchase Order No. [312-0133-0521]**
301 Alan Wood Road, Conshohocken PA 19428 ✦ PH: (610) 832-1000  ✦ FAX: (610) 832-1005

18

MB00001217

"Acceptance Procedures"). Contractor shall be deemed to have accepted all Products if the released containers have not been rejected within eight (8) days of the date of module delivery to the Delivery Point. Any claims for non-conforming Product received after acceptance of the Product shall be resolved according to Exhibit E—Product Warranty.

Vendor shall not have any obligation to repair or replace or refund any portion of the Contract Price to Contractor for Product that has been subjected to misuse, abuse, or damage from mishandling, accident, or disaster after delivery to the Delivery Point. Any Product returned to Vendor that was damaged due to Contractor error or misuse will be held by Vendor for ten (10) days.

30.  DISPUTE RESOLUTION

a)  In the event of any dispute arising under this Agreement, within ten (10) Days following the receipt of a written notice of such dispute, the Vendor and Contractor shall meet, negotiate and attempt, in good faith, to resolve the dispute quickly, informally and inexpensively. If the Parties are unable to resolve a dispute arising hereunder within thirty (30) days of initiating such discussions, or within forty (40) Days after notice of the dispute, Vendor or Contractor may submit the dispute for arbitration before American Arbitration Association in Trenton, New Jersey by three arbitrators appointed in accordance with the corresponding rules of arbitration. The arbitration shall be conducted in English. The award through arbitration shall become final and binding on the Parties, and the Parties agree to waive any right of appeal against the arbitration award.

b)  Obligations to Pay Charges. Except as otherwise expressly provided in this Contract, each Party shall be solely responsible for and bear its own costs, without reimbursement by the other Party, of prosecuting or defending any dispute under this Contract, including its attorneys' fees.

c)  Pending Dispute: Duty to Continue. Pending the resolution of a dispute, Vendor shall continue to perform the Work consistent with the applicable provisions of this Contract.

31.  ATTORNEY'S FEES.

If any legal action is brought for the enforcement of this Agreement or because of an alleged dispute, default, misrepresentation, or breach in connection with any of the provisions of this Agreement, Vendor and the Contractor shall be responsible for its own attorneys' fees and costs.

32.  U.S FOREIGN CORRUPT PRATICES ACT (FCPA)

a)  The Vendor undertakes to protect the standards of business practice of Contractor at all times and to act in such a way as to uphold the Contractor's good name and reputation and not to do or attempt to do any act or thing which is intended and/or which in fact causes any damage to or brings discredit upon the Contractor. In particular, the Vendor shall not, directly or indirectly:

i.  Offer or give or agree to give to any director, officer, employee, or agent of the Contractor or of the Client any gift or consideration of any kind as an inducement or reward for doing or for forbearing to do or for having done or forborne to do any action in relation to the obtaining or execution of this Purchase Order, Subcontract, Prime Contract, or any other contract with the Contractor or the Owner or for showing or forbearing to show any favor or disfavor to any person in relation to this Purchase Order, Subcontract, the Prime Contract, or any other contract with the Contractor or the Owner.

ii.  Induce or attempt to induce any officer, servant, employee, or agent of any private or public body to neither depart from his or her duties to his or her employer nor be involved with any such arrangement.

b)  Vendor represents that, in connection with this Contract, it has not, and covenants that it will not, contravene the following federal laws, to the extent applicable:

MB00001218

i.      The Foreign Corrupt Practices Act of the United States; The Corruption of Foreign Public Officials Act of Canada; The Bribery Act 2010 of the United Kingdom; and similar or equivalent legislation in those or any other jurisdictions that may be applicable to activities in connection with this Agreement;

ii.     The laws applicable to the maintenance of business books and records;

iii.    The laws regarding boycotts;

iv.     The laws regarding trade sanctions and export administration and control; and

v.      The laws regarding antitrust and competition.

## 33.  EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute an event of default ("Event of Default") by Vendor or a Contractor (the "Defaulting Party"):

a) A failure by a Defaulting Party to pay any amount due hereunder when, after notice by the other (the "Non-Defaulting Party") to the Defaulting Party is not cured by payment of the amount due within ten (10) days after the date that such notice is sent to the Defaulting Party.

b) Actual fraud or willful misconduct of a material nature by the Defaulting Party in connection with this Agreement.

c) Dissolution or liquidation of the Defaulting Party; provided that division into multiple entities shall not constitute dissolution or liquidation.

d) The filing of a petition in voluntary bankruptcy or insolvency or for reorganization or arrangement of the Defaulting Party under the bankruptcy laws of the United States or under any insolvency act of any state, or the Defaulting Party voluntarily taking advantage of any such law or act by answer or otherwise.

e) The filing of an involuntary case in bankruptcy or any proceeding under any other insolvency law against the Defaulting Party as debtor or its parent or any other Affiliate that could materially impact the Defaulting Party's ability to perform its obligations hereunder; provided, however, that the Defaulting Party does not obtain a stay or dismissal of the filing within one hundred eighty
(180)
days.

f) If any representation or warranty made by the Defaulting Party in this Agreement proves to have been false or misleading in any material respect when made or ceases to remain true during the term of this Agreement if such cessation would reasonably be expected to result in a Material Adverse Effect on the Non-Defaulting Party, it shall constitute an Event of Default unless cured within sixty (60) days after the date of written notice from the Non-Defaulting Party to the Defaulting Party.

g) A failure by the Defaulting Party to fully and promptly perform any of its obligations hereunder and continuation of such failure for a period of thirty (30) days following the date of notice of such failure given by the Non-Default. ng Party to the Defaulting Party unless the failure is then the subject of a dispute resolution proceedir;

**Remedies Upon Event of Default.** Upon the occurrence of an Event of Default by the Defaulting Party the Non-Defaulting Party shall have the following rights within sixty (60) days' notice: (a) to terminate this Agreement and/or any outstanding Purchase Orders by written notice to the Defaulting Party; (b) to

.Purchase Order Terms and Conditions          Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ✦PH: {610) 832-1000 ✦FAX: {610) 832-1005
20

MB00001219

suspend performance of its obligations and duties hereunder upon written notice to the Defaulting Party; and (e) to pursue any other remedy given under this Agreement or now or hereafter existing at law or in equity or otherwise.

**Duty to Mitigate.** Each Party agrees that it has a duty to mitigate damages and covenants that it will use reasonable efforts to minimize any damages it may incur as a result of the other Party's performance or non-performance of this Agreement.

34.  GUARANTEED SHIPPING AND TERMINATION

If the Shipping Date for all Products being sold to Contractor pursuant to an Invoice is not on or before the date that is twenty-one (21) days after the Anticipated Shipping Date for such Products, Contractor shall have the right to (i) declare a material breach and terminate the Purchase Order without any further liability to Vendor, except for the Break-Up Fee and Late Delivery Payment set forth herein and (ii) receive from Vendor any amounts previously paid for such terminated Products.

35.  LENDER ACKNOWLEDGEMENT

a)  Contractor, without the approval of Vendor, may grant an interest in its rights and obligations under this Agreement, any Purchase Order (or subdivided Purchase Order) and any of the other documents to be delivered by Vendor hereunder to any Lender. Promptly after granting such interest, such Contractor shall notify Vendor in writing of the name, address, and telephone and facsimile numbers of any Lender to which Contractor's interest under this Agreement or Purchase Order has been assigned.

b)  If Contractor encumbers its interest under this Agreement, the following provisions shall apply: (i) Lender shall have the right, but not the obligation, to perform any act required to be performed by Contractor under this Agreement to prevent or cure a default by Contractor, Vendor shall execute or arrange for the delivery of such certificates, consents, opinions, amendments and other documents as may be reasonably necessary for Contractor to consummate any financing or refinancing and will enter into reasonable agreements with such Lender, including those that provide that Vendor recognizes the rights of such Lender upon foreclosure of Lender's security interest and such other provisions as may be reasonably requested by any such Lender; and (iii) Vendor agrees that no Lender shall be obligated to perform any obligation or be deemed to incur any liability or obligation provided in this Agreement or any Purchase Order on the part of Contractor or shall have any obligation or liability to Vendor with respect to this Agreement or Purchase Order except to the extent any Lender has assumed the obligations of Contractor hereunder or thereunder; provided that Vendor shall nevertheless be entitled to exercise all of its rights hereunder in the event that Lender fails to perform Contractor's obligations under this Agreement.

36.  MISCELLANEOUS

a)  **Amendments.** Any modification or amendment to this Agreement shall only be effective if it is in writing and signed by Vendor and Contractor; provided, that, for the avoidance of doubt, this Agreement may not be amended by electronic mail communications.

b)  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, but all of the counterparts together shall constitute one and the same instrument.

c)  **Severability.** If any provision of this Agreement shall be held invalid, illegal or unenforceable, the validity, legality or enforceability of the other provisions hereof shall not be affected thereby, and there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

d)  **Further Assurances.** Upon receipt of a written request from Vendor or a Contractor, the other shall execute such additional documents, instruments, and assurances and take such additional

Purchase Order Terms and Conditions          Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428  ❖PH: (610) 832-1000  ❖FAX: (610) 832-1005

21

MB00001220

actions as are reasonably necessary and desirable to carry out the terms and intent hereof. Neither Vendor nor any Contractor shall unreasonably withhold, condition, or delay its compliance with any reasonable request made pursuant to this Section.

e) **Relationship of Parties.** Vendor and the Contractor Parties shall not be deemed to be in a partner or joint venture relationship by virtue of this Agreement, nor shall they be an agent, representative, trustee or fiduciary of the other. Neither Vendor nor any Contractor shall have any authority to bind the other to any agreement.

f) **Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

g) **Facsimile or Electronic Delivery.** This Agreement may be duly executed and delivered by a Party by execution and facsimile or electronic format (including portable document format (.pdf)) delivery of the signature page of a counterpart to the other Party, and, if delivery is made by facsimile or other electronic format, the executing Party shall promptly deliver, via overnight delivery, a complete original counterpart that it has executed to the other Party, but this Agreement shall be binding on and enforceable against the executing Party whether or not it delivers such original counterpart.

h) **Waivers.** No delay or omission to exercise any right or power under this Agreement shall impair or be construed as a waiver of such right or power. A waiver of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be signed by the Person waiving its rights.

i) **Negotiated Terms.** The Parties agree that the terms and conditions of this Agreement are the result of negotiations between the Parties and that this Agreement shall not be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in the preparation of this Agreement.

j) **Fees.** Each Party each Party shall pay all of its own costs and expenses, including the fees and costs of its attorneys, consultants, contractors and representatives, incurred in connection with this Agreement.

k) **Construction and Interpretation.** Unless otherwise expressly provided for in this Agreement: (a) all references in this Agreement to Sections shall mean and refer to Sections of this Agreement; (b) a reference to a document or agreement, including this Agreement, shall mean such document, agreement or this Agreement including any amendment or supplement to, or replacement, novation or modification of this Agreement, but disregarding any amendment, supplement, replacement, novation or modification made in breach of such document, agreement or this Agreement; (c) words using the singular or plural number also shall include the plural and singular number, respectively; (d) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement (including the Exhibits hereto); (e) references to any person or entity shall be deemed to mean and include the successors and permitted assigns of such person or entity; (e) the words "includes" and "including" are not limited in any way and mean "includes or including without limitation;" (f) words of any gender include each other gender; (g) in the event of a conflict, a mathematical formula describing a concept or defining a term shall prevail over words describing a concept or defining a term; (h) references to any amount of money shall mean a reference to the amount in U.S. Dollars; and (i) the expression "and/or" when used as a conjunction shall connote "any or all of."

<u>END OF PURCHASE ORDER TERMS AND CONDITIONS</u>

[Execution of Purchase Order on Summary and Acceptance]

Purchase Order Terms and Conditions                    Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ✦PH: (610) 832-1000 ✦FAX: (610) 832-1005

22

MB00001221

<u>Exhibit A</u>
Scope / Pricing and Payment Schedule

1.  <u>Scope of Supply</u>

Vendor shall Supply <u>**300 Watt DC Photovoltaic Solar Modules**</u> on firm pricing based in accordance with the specifications, the contract terms and conditions and the delivery schedule. Vendor's scope includes all labor, materials, equipment, freight, insurance, taxes and required deliverable documentation. Any complementary work necessary to satisfy this complete scope is included in this contract.

a.  **Modules shall have a guaranteed module power mix; 100% at 300 Watts DC**

b.  **Module Positive Power Tolerance: -0 /+3 Watts**

c.  **10 yr. Warranty Insurance**

d.  **Current UL #1703 1000v UL Listed**, accepted for 1000v operation within the United States of America. <u>UL Certificate of Compliance:  QIIA.E305171 - Photovoltaic Modules and Panels with System Voltage Ratings Over 1000 Volts</u> – as set forth in Exhibit C – Module Specification Data Sheet by Vendor.

2.  <u>Pricing and Payment Schedule</u>

The total amount to be paid to the "Vendor" is **$10,550,608.00** DDP Miller Bros. jobsites in Sussex and Monmouth Counties, New Jersey.  The above amounts do not include applicable taxes per Section 14 of the Agreement.  NJ State Sales tax does not apply.

| Item No. | Description | Unit of Measure | Qty. | Total price |
|---|---|---|---|---|
| 1 | Five (5%) Due Net 5 after Executed Contract Agreement and Purchaser has received Vendor's Security Agreement (Performance Assurance) in the amount of 5% of the total contract value. | Lump Sum | 1 Payment | $527,530.00 USD |
| 2 | Shipment #1 (5MW of the Modules) - Due net 5 days after arrival at port and inspection of the released container. | Lump Sum | 1 Payment | $3,230,030.00 USD |
| 3 | Shipment #2 (5.5MW of the Modules)  - Due net 5 days after arrival at port and inspection of the released container. | Lump Sum | 1 Payment | $3,553,050 USD |
| 4 | Shipment #3 (5.00156MW of the Modules) - Due net 5 days after arrival at port and inspection of the released container. | Lump Sum | 1 Payment | $3,240,008.00 USD |

Purchase Order Terms and Conditions          Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ✦ PH: (610) 832-1000  ✦ FAX: (610) 832-1005
                                                                                    23

MB00001222

**Exhibit B**
**Delivery Schedule**

All deliveries shall be in strict accordance with the following delivery schedule dates.

| Item | Description | Delivery Date |
|------|-------------|---------------|
| 1 | First Shipment – Frankford – 5MW's | 65 days after the deposit of the down payment of the Total Purchase Price amounting to 5% thereof |
| 2 | Second Shipment – Brickyard – 2MW's Holland - 3.5MW's | 72 days after the deposit of the down payment of the Total Purchase Price amounting to 5% thereof |
| 3 | Third and Final Shipment Frankford – 5MW's + 52 Modules | 90 days after the deposit of the down payment of the Total Purchase Price amounting to 5% thereof |

Shipping Instructions:

A.  Jobsite Receiving Hours:  8:00 a.m. - 2:00 p.m. Monday through Friday except holidays as defined herein.

B.  Please notify **John Irving, Senior PM** at JIrving@millerbros.us and Gerard deLisser at GdeLisser@millerbros.us  regarding impending shipments at least three (3) working days in advance of the scheduled ship date. Notification should be via email and should include the following information:

   (1)  Purchase Order Number
   (2)  Description of items, (No. of pieces, weight of largest piece)
   (3)  Mode of shipment, PRO number and routing.

C.  MSDS (Material Safety Data Sheets) must accompany all shipments or materials may be returned at shipper's expense.

D.  Shipping Address(s):

   Brickyard (2MW): 80 Birdsall Road, Farmingdale, NJ 07727 Frankford:
   (10MW) 252 Meyer Road, Branchville, NJ 07826
   Holland: (3.5MW) Block 6, Lot 62, Township of Holland - Hunterdon County

F.  Special Notes:

   • Prepare in a manner to facilitate rigging and handling, including lifting lugs where appropriate. Visibly display special handling instructions.
   • Jobsite does not have a freight dock
   • All shipment delivered in a closed top container must be packaged in a manner to facilitate a forklift for unloading.

Purchase Order Terms and Conditions          Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ◆PH: (610) 832-1000 ◆FAX: (610) 832-1005
24

MB00001223

**Exhibit C**
**Module Specification Data Sheet**


POLY_280-300.pdf

Vendor to insert: UL Certificate of Compliance:  *QIIA.E305171 - Photovoltaic Modules and Panels with System Voltage Ratings Over 1000 Volts*

Purchase Order Terms and Conditions          Purchase Order No. [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ✳PH: (610) 832-1000 ✳FAX: (610) 832-1005

MB00001224

**Exhibit D**
**Module Packaging Details**

**Vendor to Insert**

MB00001225

Exhibit E
Vendor's Warranty

Vendor to insert

MB00001226

Exhibit F
## INTELLECTUAL PROPERTY LICENSE FOR THE PV MODULES

Supplied Under
### PURCHASE ORDER NO. 312-0133-0521 between Vendor and Contractor (the "Purchase Order")

Vendor hereby grants to Contractor under the Purchase Order and to Owner, who has entered into an Engineering Procurement and Construction Contract with Contractor (the "Contract"), at no additional cost other than the amount payable in accordance with the Contract, a perpetual, irrevocable, non-exclusive, transferable and assignable (but in each case only to the Owner under the Contract (the "Modules"), royalty free, paid up license to use, in the territory of U.S.A. only, all or any the Modules and any Intellectual Property included in the Modules delivered under the Contract solely as incorporated in the Modules (and not on a standalone basis) and solely for use in the construction, operation, maintenance, modification and decommissioning of the Facility. No other grants of licenses or rights to Owner will be implied from the provisions stated in this license. Owner shall use reasonable efforts not to remove, alter or obscure, and shall use reasonable efforts not to reproduce on all permitted copies, all of Vendor intellectual property notices contained in any Vendor Intellectual Property.

Selected defined terms used herein:

**Vendor** means Recom, Corp.., its parents, subsidiaries, affiliates and assigns

**Intellectual Property** means all intellectual property or other proprietary rights including all rights of inventorship and authorship, inventions, licenses, patents, patent applications and know-how for any product, process, method, machine, manufacture, design, composition of matter or any new or useful improvement thereof, as well as copyrights, trademark, trade dress and service mark rights and all rights in trade secrets, computer software, data and databases, calculations, and mask works.

**Contractor** means Miller Bros. - a Division of Wampole-Miller, Inc.

**Facility Site 1** means the Brickyard Solar Facility a 2.00 MWdc/ solar photovoltaic generation facility located in Howell, NJ 07731 - Monmouth County

**Facility Site 2** means the Frankford Solar Facility a 10.00 MWdc/ solar photovoltaic generation facility located in Branchville, NJ 07826 – Sussex County

Acknowledged by:

Recom, Corp.

By: _____

Its: _____

Purchase Order Terms and Conditions          Purchase Order No: [312-0133-0521]
301 Alan Wood Road, Conshohocken PA 19428 ◆PH: (610) 832-1000 ◆FAX: (610) 832-1005

28

MB00001227